323 S.E.2d 140

**Gregory Scott BISHOP**

v.

**W. Joseph McCOY, Commissioner of the West Virginia Department of Corrections; Manfred Holland, Warden, West Virginia State Penitentiary; Jerry Hedrick, Warden, Huttonsville Correctional Center; and Frank Phares, Deputy Warden, Huttonsville Correctional Center.**

No. 16328.

Supreme Court of Appeals of West Virginia.

Nov. 14, 1984.

Daniel F. Hedges and Philip Briganti, Beckley, for petitioner.

John Ernest Shank, Asst. Atty. Gen., Charleston, for respondents.

McHUGH, Chief Justice:

In this mandamus action, the petitioner, Gregory Scott Bishop, an inmate in this State's correctional system, challenges the conditions of his protective custody. The

respondents include the Commissioner of the West Virginia Department of Corrections, the Warden of the West Virginia Penitentiary at Moundsville and the Warden and Deputy Warden of the West Virginia Medium Security Prison at Huttonsville. This Court has before it the petition and answer, all matters of record and the briefs and argument of counsel.

I

THE FACTS

In February, 1984, the petitioner, serving a sentence at Huttonsville (a medium security prison) for breaking and entering, broke up a fight between two inmates. As a result of stopping the fight and providing prison authorities with information concerning the fight, the petitioner was allegedly threatened by various inmates. The petitioner was thereupon placed in protective custody at Huttonsville.

Inmates at Huttonsville are provided with protective custody only on a temporary basis. Long-term protective custody is not presently available at Huttonsville, and the petitioner asserts that, in fact, the respondents do not intend to have a protective custody unit at Huttonsville in the future.[1] The petitioner and respondents agree that as a protective custody inmate at Huttonsville, the petitioner had "no access to college courses, drug and alcohol abuse programs, or any other rehabilitative services." See petition, paragraph 12.

Thereafter, the petitioner was removed from protective custody and placed in the general prison population at Huttonsville. Threats against the petitioner apparently continued, however, and he was returned to protective custody.

In April, 1984, the petitioner was transferred from Huttonsville to the protective custody unit of the West Virginia Penitentiary at Moundsville.[2] The petitioner indicates that, even though he was placed in protective custody at Moundsville,[3] he continued to be threatened by various inmates.[4] He asserts, for example, that he was "threatened with a knife in the dining hall" at Moundsville.

II

CONTENTIONS OF THE PARTIES

The petitioner asserts that his transfer to the penitentiary at Moundsville has resulted in a denial to him of both protection from harm and access to various rehabilitative programs, even though that transfer enabled the petitioner to remain in protective custody on a long-term basis. The petitioner asks this Court to direct the respondents to transfer him to a work release facility, to Anthony Center or back to the medium security prison at Huttonsville. If returned to Huttonsville, the petitioner asks this Court to direct the respondents to

---

1. Paragraph 7(3) of the petition contains the following allegations:

Unit 10A at Huttonsville Correctional Center, which was formerly used for protective custody, has been converted to other uses. Another unit in the hospital area is now being temporarily used for protective custody. The respondents do not intend in the future to have a protective custody unit at Huttonsville Correctional Center.

The respondents, in their answer, admit those allegations and further state that "there is a protective custody unit at Huttonsville, but it is only used for the temporary housing of inmates."

2. The petitioner indicates that his transfer from the medium security prison at Huttonsville to the state penitentiary at Moundsville was in retaliation by prison authorities for the petitioner's suggestion that he was going to obtain a lawyer to protest, inter alia, the alleged failure of prison authorities to protect the petitioner at Huttonsville. The respondents, however, deny that the transfer was retaliatory. Specifically, paragraph 4 of the affidavit of respondent Phares, Deputy Warden at Huttonsville, states as follows: "I have never told Gregory Scott Bishop that I did not want him to seek legal assistance. I have neither acted in retaliation against Gregory Scott Bishop for attempting to obtain legal assistance nor am I aware of any other person who has done so."

3. The petitioner has been placed in protective custody at Huttonsville pending the outcome of this proceeding.

4. The circumstances relating to the fight, described above, at Huttonsville involved several inmates. Some of those inmates were subsequently transferred to Moundsville.

develop a protective custody unit at Huttonsville which is adequate to (1) safeguard protective custody inmates from harm and (2) afford such inmates various rehabilitative programs, including drug and alcohol rehabilitation programs and educational programs.

On the other hand, the respondents indicate, *inter alia,* that the predominate protective custody requirements of this State are, in fact, met by the protective custody unit of the West Virginia Penitentiary at Moundsville[5] and that the petitioner's transfer to that unit was necessary. As the affidavit of respondent Phares, Deputy Warden at Huttonsville, states in part:

All protective custody at Huttonsville Correctional Center is of a temporary nature. This is because many of the disputes that cause a particular inmate to check into protective custody are resolved and the inmate is returned to the prison population. Those inmates who cannot be returned to the prison population and must have permanent protective custody are transferred to the West Virginia Penitentiary at Moundsville, a portion of which has been designated as the Department of Corrections Protective Custody Unit.

Accordingly, the respondents argue, the creation of a protective custody unit at Huttonsville, or elsewhere in this State, comparable to the unit at Moundsville is not justified. The respondents deny that the petitioner is entitled to relief in mandamus.

Various statutes have been promulgated in this State relating to the transfer of prison inmates from one correctional institution to another. *W. Va. Code,* 25–1–16 [1972], provides, in part, that the Commissioner of the Department of Corrections "shall have authority to cause the transfer of any patient or inmate from any state institution or facility to any other state or federal institution or facility which is better fitted for the care or treatment of such patient or inmate, or for other good cause or reason." Furthermore, *W. Va. Code,* 28–5A–5 [1970], provides as follows: "Upon the request of the warden of the West Virginia penitentiary or the warden of Huttonsville correctional center, the commissioner of ... [the department of corrections] may, in his discretion, order the transfer of prisoners from one institution to the other." Finally, *W. Va. Code,* 62–13–5 [1977], provides, in part, as follows:

All persons committed by courts of criminal and juvenile jurisdiction for custody in penal, correctional or training institutions under the jurisdiction of the commissioner of corrections shall be committed to an appropriate institution, but the commissioner (or the director if the commissioner so approves) shall have the authority to and may order the transfer of any person to any appropriate institution within the department. However, ... no one may be transferred to a state prison unless the crime for which such person is incarcerated was of the grade which would warrant direct commitment to the prison.

....
Outside recreation and exercise shall be conducted at the scheduled times, except during severe weather.
....
*The inmate's rights to the courts will prevail!*
....
GED cell study courses shall be provided any Protective Custody inmate desiring same. The Unit Commander will insure they are properly assigned to the classes through the Director of Education and their caseworker.

College classes will be conducted in the unit for approved inmates. The Unit Supervisor will insure the program is conducted and that space is provided.

---

5. By written directive dated April 28, 1980, the Commissioner of the West Virginia Department of Corrections designated this State's penitentiary at Moundsville as the location of the "Department of Corrections Protective Custody Unit." *See* respondents' exhibit no. 1. Certain "Operational Guidelines," effective July 21, 1983, for that protective custody unit are set forth by the warden of the penitentiary in a written "staff notice." *See* respondents' exhibit no. 2. Various provisions of those operational guidelines state as follows:

The systemic purpose of the Protective Custody Unit is to provide safe, secure and sanitary housing for the inmates of the Department of Corrections that fear for their personal safety in the general population.

The validity of those transfer statutes is not raised in this action. *See* n. 11, *infra*. The principal question before this Court is whether, under the circumstances of this action, the petitioner's constitutional right against the infliction of cruel and unusual punishment has been violated.[6] For the reasons stated below, we answer that question in the affirmative.

## III

## CONDITIONS RELATING TO PROTECTIVE CUSTODY

■ This Court has held that inmates in this State's correctional system have a constitutional right to be "reasonably protected from constant threat of violence and sexual assault" by fellow inmates and a right, enforceable through the West Virginia Constitution, to rehabilitation. We are of the opinion that those rights, resting as they do upon a constitutional foundation, apply to protective custody inmates in this State, as well as to other prison inmates. We discuss those rights below. In section IV of this opinion, we address the more specific problem of the petitioner's transfer from the medium security prison at Huttonsville to the penitentiary at Moundsville.

■ Referring to the Huttonsville correctional center, this Court in *Hackl v. Dale*, 171 W.Va. 415, 299 S.E.2d 26 (1982), recognized a need to segregate "the violent from the non-violent confinees." 171 W.Va. at 418, 299 S.E.2d at 30. In that action, the petitioner, an inmate at Huttonsville, allegedly suffered a sexual assault by a fellow inmate, and the petitioner thereupon sought the improvement of his conditions of confinement. Concluding that the record in *Hackl* failed to demonstrate that the petitioner's conditions of confinement constituted cruel and unusual punishment,[7] we, nevertheless, held as follows in syllabus point two:

A prisoner has a right, secured by the Eighth and Fourteenth Amendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates, and he need not wait until he is actually assaulted to obtain relief. In order to meet the foregoing standard two conditions must be shown: (1) Whether there is a pervasive risk of harm to inmates from other prisoners, and, if so, (2) whether the officials are exercising reasonable care to prevent prisoners from intentionally harming others or from creating an unreasonable risk of harm.

*See also Harrah v. Leverette*, 165 W.Va. 665, 271 S.E.2d 322, 328 (1980).

The right of an inmate to reasonable protection, as described in *Hackl*, is supported by various state statutes. That inmate violence and threats to individual safety are not to be condoned in this State's correctional institutions is implicit in the mandate of *W.Va.Code*, 25–1–3 [1977], that the Commissioner of the West Virginia Department of Corrections "shall manage, direct, control and govern" those institutions. In that regard, it should be noted that, pursuant to *W.Va.Code*, 28–5–3 [1974], the Warden of the West Virginia Penitentiary at Moundsville is charged with the "internal police and management" of the penitentiary and must "enforce strict discipline among the convicts." *See also W.Va.Code*, 28–5–5 [1974]. Pursuant to *W.Va.Code*, 28–5A–3 [1970], the duties of the warden of the West Virginia Medium Security Prison at Huttonsville are similar

---

6. U.S. Const. amend. VIII provides as follows: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

　Similarly, W.Va. Const. art. III, § 5 provides, in part, as follows: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

7. In *Hackl v. Dale, supra,* this Court stated as follows:

The record does not demonstrate the presence of other sexual assaults such that a reasonable fear for safety can be said to have existed or that prison officials would have been reasonably apprised of the existence of the problem and the need for protective measures.

　We are not aware of any decision whereby an isolated incident of sexual assault on one inmate has resulted in a finding that the constitutional prohibition against cruel and unusual punishment has been violated.

171 W.Va. at 417–418, 299 S.E.2d at 29.

to the duties of the warden of the penitentiary at Moundsville.

■ The right of an inmate to reasonable protection from harm, described in *Hackl*, does not depend upon whether that inmate is in protective custody. If violence to an inmate housed in the general population of a prison is likely to occur, it is proper for that inmate to be placed in protective custody, and the right of that inmate to reasonable protection continues during that inmate's stay in protective custody.

With respect to the issue of rehabilitation, article 13 of chapter 62 of the West Virginia Code, entitled "Corrections Management," contains *W. Va. Code*, 62–13–1 [1977], which provides as follows:

This article shall be liberally construed, to the end that persons committed to institutions of the State for crime or delinquency shall be afforded individual and group treatment to reestablish their ability to live peaceably and, consistent with the protection of the community, to release such individuals at the earliest possible date, and to establish a just, humane and efficient program, and to avoid duplication and waste of effort and money on the part of public and private agencies.

■ Furthermore, *W. Va. Code*, 62–13–4 [1977], provides, in part, as follows:

To accomplish the purposes of this article, the commissioner (or the director of corrections management if one is appointed) shall:

. . . .

f. Establish a system of classification of inmates, through a reception and examination procedure, and in each institution a classification committee and procedure for assignment of inmates within the programs of the institution;

g. Establish, maintain and direct a varied program of education for inmates in all institutions within the department;

h. Supervise the treatment, custody and discipline of all inmates and the maintenance of the institutions and their industries. . . .

Those two statutes were discussed by this Court in *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1981), an action in which certain inmates at the West Virginia State Prison for Women at Pence Springs sought relief in mandamus to compel the respondents to provide them with meaningful educational, rehabilitative and exercise programs. Noting that convicted prisoners do not forfeit fundamental constitutional protections by reason of their conviction and confinement and that *W. Va. Code*, 62–13–1 [1977], and *W. Va. Code*, 62–13–4 [1977], indicate "that the Legislature requires rehabilitation to be the primary goal of the West Virginia corrections system . . .," 171 W.Va. at 252, 298 S.E.2d at 788, this Court, in *Cooper v. Gwinn*, granted relief to the petitioners. Syllabus point 2 of that action states as follows: "Inmates incarcerated in West Virginia state prisons have a right to rehabilitation established by W.Va.Code §§ 62–13–1 and 62–13–4 (Cum. Supp.1980), and enforceable through the substantive due process mandate of article 3, section 10 of the West Virginia Constitution." [8]

---

**8.** This Court noted, in *Cooper v. Gwinn, supra,* as follows:

[T]he Commissioner of Corrections has the duty to faithfully administer the State Prison for Women "to the end that persons committed to institutions of the State for crime and delinquency shall be afforded individual and group treatment to reestablish their ability to . . . [live] peaceably. . . ." W.Va.Code § 62–13–1.

. . . .

We realize that prison officials are hampered in their efforts by a lack of funds. However, the lack of funds is not a valid excuse for denying inmates, and society as a whole, the constitutional right to the benefit

of legislative enactments which clearly establish the duty of the Department of Corrections to rehabilitate individuals charged to its care, and the concommitant [sic] right of those individuals to demand the benefit of those laws.

171 W.Va. at 253, 298 S.E.2d at 789, 791–792.

In *Cooper v. Gwinn,* we adopted as the standards which will satisfy the requirements of *W. Va. Code*, 62–13–1 [1977], and *W. Va. Code*, 62–13–4 [1977], "the standards for adult correctional institutions promulgated by the American Correctional Association in cooperation with the Commission on Accreditation for Corrections regarding classification, inmate work programs, and academic and vocational edu-

■ This Court is of the opinion that the right to rehabilitation, grounded upon statutory and constitutional law as described in *Cooper v. Gwinn,* belongs to protective custody inmates, as well as to other prison inmates. As the cases discussed below indicate, protective custody inmates may challenge the conditions of their confinement.[9]

In *Nadeau v. Helgemoe,* 561 F.2d 411 (1st Cir.1977), New Hampshire state prisoners in protective custody[10] challenged the conditions of their confinement. Issues such as exercise and library access within the prison were raised. Recognizing that the administration of the New Hampshire state prison was not immune from constitutional scrutiny, the court in *Nadeau* remanded the action to the district court for further consideration of the petitioners' claims. Although stating that the "judgments of prison officials concerning the necessity of particular practices must be given great weight," 561 F.2d at 419, the court in *Nadeau* further stated as follows:

Prison administrators do not have unlimited authority over their charges. Even when they do not create barbaric or indecent conditions of confinement, prison officials are subject to a limited judicial check; their actions cannot be entirely arbitrary and capricious.

. . . .

[G]enuinely barbarous or shocking prison conditions must not be tolerated; nor are [protective custody] ... prisoners to be deprived of privileges enjoyed by others arbitrarily or without reason.

561 F.2d at 419, 420–21.

In *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I.1977), *aff'd,* 616 F.2d 598 (1st Cir.1980), *cert. denied,* 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980), the federal district court in Rhode Island, upon a finding that conditions in the Rhode Island Adult Correctional Institutions were deplorable, ordered major improvements. Some of those improvements related to the conditions of confinement of protective custody inmates.

Although the protective custody inmates in *Palmigiano* were housed in a medium security building, the conditions of that custody were lamentable. As the court described:

In nearly every relevant respect, the approximately 160 inmates in protective custody are subjected to a regime of idleness more complete, and more devastating, than that suffered by prisoners incarcerated in the Maximum Security building. These inmates have not committed disciplinary violations, and their placement in protective custody is not intended as punishment. They literally fear for their lives, and in return for a measure of safety have been forced to bargain away a substantial part of the already meager program activity available to inmates in the general population.

. . . .

171 W.Va. at 261, 298 S.E.2d at 797.

**9.** As we noted in *Harrah v. Leverette, supra:* "Conditions of prison confinement can be tested by the Eighth Amendment ban on cruel and unusual punishment." 165 W.Va. at 673, 271 S.E.2d at 328.

**10.** Referring to its use in New Hampshire, the court in *Nadeau v. Helgemoe, supra,* described "protective custody" as follows:

Protective custody, as the name implies, is for prisoners who fear for their safety if they are housed with the general population. Some prisoners in protective custody have cooperated with the state in criminal prosecutions; others have been assaulted while in the general population; still others have run up large debts to other prisoners; some simply cannot get along with their fellow prisoners. 561 F.2d at 412.

cation...." 171 W.Va. at 259–260, 298 S.E.2d at 795–96. Those standards, attached as an appendix to the *Cooper v. Gwinn* opinion, provide, in part, as follows:

2–4408 Written policy and procedure provide for identification of special needs inmates. (Essential)

Discussion: Special needs inmates include, but are not limited to, drug addicts, drug abusers, alcoholics, alcohol abusers, inmates who are emotionally disturbed, mentally retarded, suspected mentally ill, or who pose high risk *or require protective custody.* Procedures should exist to identify the number, type and frequency of commitment of those groups of inmates. When numbers or frequency of commitment warrant, special programs should be instituted for the appropriate management and effective handling of these inmates. (emphasis added)

[T]he lawlessness that prevails at the ... [Rhode Island Adult Correctional Institutions] has led to an incredibly high proportion of inmates being held in protective custody, many of them at their own request. For these inmates, the price of security is high. The totality of conditions in Medium, where most of these men are housed, constitute cruel and unusual punishment, the filth, noise, and idleness of life in Medium shock the conscience. In addition, ... [prison authorities] have seen fit to impose additional penalties upon protective custody inmates in the form of severely restricted access to the few available rehabilitative programs, more limited opportunities to exercise, and a reduced number of visits from the outside world.

443 F.Supp. at 969–70, 982.

The district court in *Palmigiano*, in ordering, *inter alia*, that certain educational, vocational and recreational opportunities be made available to protective custody inmates, stated as follows:

It is true that the mere fact that conditions in protective custody are more disagreeable than those generally prevalent at the ... [Rhode Island Adult Correctional Institutions] would not of itself raise constitutional problems, *cf. Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532 [2538], 49 L.Ed.2d 451 (1976) (interprison transfers). Nevertheless, where the State has itself created the conditions that necessitate the widespread use of protective custody, where the totality of conditions of protective custody violate the Eighth Amendment, and where the restrictions complained of amount to additional punishment for which no penological explanation is offered, the additional restrictions are offensive to due process and equal protection and must be enjoined. (citations omitted) [11]

443 F.Supp. at 982.

This Court has no interest in operating

---

**11.** In the *Meachum* action, cited above in *Palmigiano*, certain Massachusetts inmates at a medium security institution were transferred to a maximum security institution at which the conditions of incarceration were substantially less favorable. Although those transfers were precipitated by the alleged misconduct of the transferred inmates, Massachusetts law did not require prison transfers to be based upon findings of misconduct. The Supreme Court of the United States held, in *Meachum*, that the due process clause of the Fourteenth Amendment did not entitle those state inmates to hearings concerning the propriety of the transfers (in the absence of state law or practice conditioning such transfers upon proof of serious misconduct or the occurrence of other events). As the court stated:

[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system *so long as the conditions of confinement do not otherwise violate the Constitution.* The Constitution does not require that the State have more than one prison for convicted felons; nor does it guarantee that the convicted prisoner will be placed in any particular prison if, as is likely, the State has more than one correctional institution.

. . . .

That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.

427 U.S. at 224, 225, 96 S.Ct. at 2538, 49 L.Ed.2d at 459. (emphasis added).

*Meachum* contains a dissenting opinion in which it is noted that more restrictive conditions are "inherent in a maximum-security institution as compared to a medium-security institution." 427 U.S. at 235, 96 S.Ct. at 2543, 49 L.Ed.2d at 465.

In a companion case to *Meachum*, the Supreme Court of the United States, in *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), reached a similar result. In *Montanye*, a New York state inmate, who allegedly violated prison rules by circulating a protest document, was transferred from one maximum security institution to another maximum security institution. The inmate asserted that the transfer was an act of reprisal by prison authorities. Comparable to the facts in *Meachum*, however, under New York law, the transfer of prison inmates was not conditioned upon or limited to the occurrence of inmate misconduct. The court thus concluded, in *Montanye*, that the' due process clause of the Fourteenth Amendment did not require a hearing in connection with the inmate's transfer. As the court stated:

As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him *and is not otherwise violative of the Constitution,* the Due process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.

427 U.S. at 242, 96 S.Ct. at 2547, 49 L.Ed.2d at 471. (emphasis added).

protective custody units in this State.[12] Nor, do we seek to engage in an exercise in making life more pleasant for protective custody inmates. *Palmigiano v. Garrahy, supra,* at 979. We intend, rather, to ensure that the treatment by the respondents of protective custody inmates, such as the petitioner, comports with the principles of law outlined above. The right of prison inmates to be reasonably protected from constant threat of violence and sexual assault by fellow inmates is one of those principles. The right of prison inmates to rehabilitation is another principle. As reflected in our decisions in *Hackl v. Dale* and *Cooper v. Gwinn,* those particular principles have a constitutional dimension, and we believe they should be applied to protective custody inmates.

■ Consequently, we hold that protective custody inmates, as well as other prison inmates in the West Virginia correctional system, have rights, as described in *Hackl v. Dale,* 171 W.Va. 415, , 299 S.E.2d 26 (1982), and *Cooper v. Gwinn,* 171 W.Va. 245, 298 S.E.2d 781 (1981), to (1) reasonable protection from constant threat of violence and sexual assault by fellow inmates and (2) rehabilitation.

## IV

### THE TRANSFER

. ■ The record in this action indicates that the petitioner's protective custody resulted from the action he took to break up a fight between two Huttonsville inmates. That action resulted in a need to place the petitioner in protective custody. We are of the opinion, however, that the transfer of the petitioner from Huttonsville, a medium security prison, to the penitentiary at Moundsville was unwarranted, even though the petitioner was placed in protective custody in Moundsville. That transfer, under the circumstances of this action, was punitive[13] and constitutes cruel and unusual punishment, and the petitioner should have been afforded protective custody, for the time his circumstances required, at an institution other than Moundsville.

We are not unmindful of the "Department of Corrections Protective Custody Unit" at Moundsville and the written guidelines concerning that unit. However, the penitentiary at Moundsville is inherently more restrictive than the medium security prison at Huttonsville (*see* the dissenting opinion in *Meachum, supra,* n. 11), and the transfer of the petitioner in this action was based at least in part upon the fact that there are presently little or no protective custody facilities at Huttonsville. We find the petitioner's transfer to be overly punitive and violative of his right against the infliction of cruel and unusual punishment.

This Court stated in *Harrah v. Leverette, supra,* that "[c]ourts have affirmatively remedied petitioners' complaints by ordering substantial changes in prison conditions...." 165 W.Va. at 680, 271 S.E.2d at 331.

---

Unlike *Meachum* and *Montanye,* this Court does not have before it in this action the issue of whether a due process hearing is required concerning the petitioner's transfer. *Meachum* and *Montanye* are therefore not dispositive of this action. As this opinion describes, the petitioner's transfer was "otherwise violative of the Constitution." *See also Watson v. Whyte,* 162 W.Va. 26, 245 S.E.2d 916 (1978); J. Palmer, *Constitutional Rights of Prisoners* § 12.3 (2nd ed. 1977).

**12.** This Court, in *Harrah v. Leverette, supra,* stated as follows:

Management of a prison system is an executive, not a judicial, function. We recognize that it is a difficult and important task. Maintaining security among persons who have previously indicated a reticence to abide by the law takes great skill and competence. We do not claim expertise in this area and prefer not to interfere with prison management, but we cannot allow the warders' difficulty to outweigh inmates' constitutional rights.
271 S.E.2d at 331.

**13.** The United States Court of Appeals, Seventh Circuit, in *Buise v. Hudkins,* 584 F.2d 223 (7th Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979), indicated that it is wrongful for a state inmate to be transferred from a minimum security institution to a maximum security institution in retaliation for the inmate's exercise of constitutional rights. 584 F.2d at 232. That court further indicated that the test for whether such a transfer is punitive rather than administrative involves "an inquiry into, among other things, the relative conditions in the institutions and the harms of dislocation itself, and how the inmate perceived them." 584 F.2d at 229, n. 8.

■ Upon all of the above, we hold that in securing the rights of protective custody inmates to reasonable protection from constant threat of violence and sexual assault and to rehabilitation, the Commissioner of the West Virginia Department of Corrections is hereby directed to (1) establish and maintain, in addition to the safeguarding of protective custody inmates of the West Virginia Penitentiary at Moundsville, protective custody facilities for the safeguarding, for such periods of time as may be required, of protective custody inmates of institutions other than the West Virginia Penitentiary at Moundsville, and such facilities shall be in addition to the Protective Custody Unit at the West Virginia Penitentiary at Moundsville and shall be at a location or locations other than at the penitentiary at Moundsville; (2) ensure that all protective custody inmates, whether of the West Virginia Penitentiary at Moundsville or otherwise, shall, in continuing their rehabilitation, be entitled to the same educational, vocational, recreational and other program opportunities to which other prison inmates in this State are entitled and (3) ensure that no prison inmate under the supervision of the West Virginia Department of Corrections who is not a maximum security inmate is transferred, solely for the purpose of placing that inmate in protective custody, to a maximum security institution.

In so holding, we reaffirm, in the context of protective custody, the rights of prison inmates recognized in *Hackl v. Dale* and *Cooper v. Gwinn.* *See also Tasker v. Griffith,* 160 W.Va. 739, 238 S.E.2d 229 (1977).

Accordingly, we hereby direct that the respondents place the petitioner in protective custody facilities as described above (other than at Moundsville) for such period of time as may be required and that the conditions of his protective custody be consistent with the principles of this opinion.

Writ granted as moulded.