373 S.E.2d 489

**IMPERIAL COLLIERY COMPANY**

v.

**Danny H. FOUT.**

**No. 17428.**

Supreme Court of Appeals of West Virginia.

Sept. 16, 1988.

Charles F. Donnelly, United Mine Workers of America, Charleston, for Danny H. Fout.

Larry W. Blalock, Jackson, Kelly, Holt & O'Farrell, Charleston, for Imperial Colliery Co.

MILLER, Justice:

Danny H. Fout, the defendant below, appeals a summary judgment dismissing his claim of retaliatory eviction based on the provisions of W.Va.Code, 55–3A–3(g),[1] which is our summary eviction statute. Imperial Colliery had instituted an eviction proceeding and Fout sought to defend against it, claiming that his eviction was in retaliation for his participation in a labor strike.

This case presents two issues: (1) whether a residential tenant who is sued for possession of rental property under W.Va. Code, 55–3A–1, *et seq.*, may assert retaliation by the landlord as a defense, and (2) whether the retaliation motive must relate to the tenant's exercise of a right incidental to the tenancy.

Fout is presently employed by Milburn Colliery Company as a coal miner. For six years, he has leased a small house trailer lot in Burnwell, West Virginia, from Imperial Colliery Company. It is alleged that Milburn and Imperial are interrelated companies.[2] A written lease was signed by Fout and an agent of Imperial in June, 1983. This lease was for a primary period of one month, and was terminable by either party upon one month's notice. An annual rental of $1.00 was payable in advance on January 1 of each year. No subsequent written leases were signed by the parties.

---

**1.** W.Va.Code, 55–3A–3(g), provides:

"Absent an issue of title, *retaliation*, or breach of warranty, and in the event of an appeal wherein the tenant prevails, if the term of the lease has expired the relief ordered by the appellate court shall be for monetary damages only and shall not restore the tenant to possession. During the pendency of any such appeal no tenant shall be entitled to remain in possession of the leasehold if the period of the tenancy has otherwise expired." (Emphasis added).

**2.** Fout argues that Imperial and Milburn are one "employer," and should be regarded as a single entity for purposes of suit. This contention is supported by an affidavit by Howard L. Green, a former officer of District 17 of the United Mine Workers of America. We shall, for the purposes of our review, accept the allegation as true.

On February 14, 1986, Imperial advised Fout by certified letter that his lease would be terminated as of March 31, 1986. Fout's attorney corresponded with Imperial before the scheduled termination date. He advised that due to various family and monetary problems, Fout would be unable to timely vacate the property. Imperial voluntarily agreed to a two-month extension of the lease. A second letter from Fout's attorney, dated May 27, 1986, recited Fout's personal problems and requested that Imperial's attempts to oust Fout be held "in abeyance" until they were resolved. A check for $1.00 was enclosed to cover the proposed extension. Imperial did not reply.

On June 11, 1986, Imperial sued for possession of the property, pursuant to W.Va. Code, 55–3A–1, *et seq.*, in the Magistrate Court of Kanawha County. Fout answered and removed the suit to the circuit court on June 23, 1986. He asserted as a defense that Imperial's suit was brought in retaliation for his involvement in the United Mine Workers of America and, more particularly, in a selective strike against Milburn. Imperial's retaliatory motive was alleged to be in violation of the First Amendment rights of speech and assembly, and of the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* Fout also counter-claimed, seeking an injunction against Imperial and damages for annoyance and inconvenience.

After minimal discovery, Imperial moved for summary judgment. The circuit court granted Imperial's motion in an amended judgment order dated October 8, 1986, relying principally upon *Criss v. Salvation Army Residences*, 173 W.Va. 634, 319 S.E.2d 403 (1984). The court concluded that the retaliation defense "must derive from, or in some respect be related to, exercise by the tenant of rights incident to his capacity as a 'tenant'." Since Fout's participation in the labor strike was admittedly unrelated to his tenancy, the defense was dismissed and possession of the property was awarded to Imperial. It is from this order that Fout appeals.

Our initial inquiry is whether retaliation by the landlord ·may be asserted by the tenant as a defense in a suit under W.Va. Code, 55–3A–3(g). We addressed this issue in *Criss v. Salvation Army Residences, supra,* and stated without any extended discussion that this section "specifically provides for the defense of retaliation." 173 W.Va. at 640, 319 S.E.2d at 409. We did not have occasion in *Criss* to trace the development of the retaliatory eviction defense.

It appears that the first case that recognized retaliatory eviction as a defense to a landlord's eviction proceeding was *Edwards v. Habib*, 397 F.2d 687 (D.C.Cir. 1968), *cert. denied*, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969). There, a month-to-month tenant who resided in a District of Columbia apartment complex reported to a local health agency a number of sanitary code violations existing in her apartment. The agency investigated and ordered that remedial steps be taken by the landlord, who then advised Edwards that her lease was terminated. When the landlord sued for possession of the premises, Edwards alleged the suit was brought in retaliation for her reporting of the violations. A verdict was directed for the landlord and Edwards appealed.

On appeal, the court reviewed at length the goals sought to be advanced by local sanitary and safety codes. It concluded that to allow retaliatory evictions by landlords would seriously jeopardize the efficacy of the codes. A prohibition against such retaliatory conduct was therefore to be implied, even though the regulations were silent on the matter.[3]

---

**3.** The pertinent language of *Edwards*, 397 F.2d at 700–01, is:

"The housing and sanitary codes, especially in light of Congress' explicit direction for their enactment, indicate a strong and pervasive congressional concern to secure for the city's slum dwellers decent, or at least safe and sanitary, places to live. Effective implementation and enforcement of the codes obviously depend in part on private initiative in the reporting of violations. Though there is no official procedure for the filing of such complaints, the bureaucratic structure of the Department of Licenses and Inspections establishes such a procedure, and for the fiscal year 1966 nearly a third of the cases handled

Many states have protected tenant rights either on the *Edwards* theory [4] or have implied such rights from the tenant's right of habitability.[5] Others have utilized statutes analogous to section 5.101 of the Uniform Residential Landlord and Tenant Act, 7B U.L.A. 503 (1985),[6] which is now adopted in fifteen jurisdictions.[7] Similar

landlord and tenant reform statutes in seventeen other states also provide protection for tenancy-related activities.[8]

■ Under W.Va.Code, 37–6–30, a tenant is, with respect to residential property, entitled to certain rights to a fit and habitable dwelling.[9] In *Teller v. McCoy,* 162

by the Department arose from private complaints. To permit retaliatory evictions, then, would clearly frustrate the effectiveness of the housing code as a means of upgrading the quality of housing in Washington." (Footnotes omitted).

4. *See, e.g., Barela v. Superior Court,* 30 Cal.3d 244, 636 P.2d 582, 178 Cal.Rptr. 618 (1981); *Alteri v. Layton,* 35 Conn.Supp. 261, 408 A.2d 18 (1979); *Wilkins v. Tebbetts,* 216 So.2d 477 (Fla. App.1968), *cert. dismissed,* 222 So.2d 753 (Fla. 1969); *Windward Partners v. Delos Santos,* 59 Haw. 104, 577 P.2d 326 (1978); *Clore v. Fredman,* 59 Ill.2d 20, 319 N.E.2d 18 (1974); *Dickhut v. Norton,* 45 Wis.2d 389, 173 N.W.2d 297, 40 A.L.R.3d 740 (1970).

5. *See, e.g., Jack Spring, Inc. v. Little,* 50 Ill.2d 351, 280 N.E.2d 208 (1972); *Berzito v. Gambino,* 63 N.J. 460, 308 A.2d 17 (1973); *Pugh v. Holmes,* 486 Pa. 272, 405 A.2d 897 (1979).

6. Section 5.101 of the Uniform Act provides, in part:
"(a) Except as provided in this section, a landlord may not retaliate by increasing rent or decreasing services or by bringing or threatening to bring an action for possession after:
"(1) the tenant has complained to a governmental agency charged with responsibility for enforcement of a building or housing code of a violation applicable to the premises materially affecting health and safety; or
"(2) the tenant has complained to the landlord of a violation [of the requirement to maintain the premises] under Section 2.104; or
"(3) the tenant has organized or become a member of a tenant's union or similar organization."
*See Marquam Investment Corp. v. Beers,* 47 Or. App. 711, 615 P.2d 1064 (1980) (upholding act against a variety of constitutional challenges.)

7. Alaska Stat. § 34.03.310; Ariz.Rev.Stat.Ann. § 33–1381; Fla.Stat.Ann. § 83.64; Haw.Rev. Stat. § 521–74; Iowa Code Ann. § 562A.36; Kan.Stat.Ann. § 58–2572; Ky.Rev.Stat.Ann. § 383.705; Mont.Code Ann. § 70–24–431; Neb. Rev.Stat. § 76–1439; N.M.Stat.Ann. § 47–8–39; Or.Rev.Stat. § 91.865; R.I.Gen.Laws § 34–18–46; S.C.Code Ann. § 27–40–910; Tenn.Code Ann. § 66–28–514; Va.Code Ann. § 55–248.39.

8. Cal.Civ.Code § 1942.5; Conn.Gen.Stat.Ann. § 47a–20; Del.Code Ann.tit. 25, § 5516; Md.

Real Prop.Code Ann. § 8–208.1; Mass.Gen.Laws Ann. ch. 186, § 18; Minn.Stat.Ann. § 566.03; Mo.Ann.Stat. § 441.620; Nev.Rev.Stat.Ann. § 118A.510; N.H.Rev.Stat.Ann. § 540:13–a; N.J.Stat.Ann. § 2A:42–10.10; N.Y.Real Prop. Law § 223–b; N.C.Gen.Stat. § 42–37.1; Ohio Rev.Code Ann. § 5321.02; Pa.Stat.Ann. tit. 68, § 250.205; Tex.Prop.Code Ann. § 92.057; Vt. Stat.Ann. tit. 9, § 4465; Wis.Stat.Ann. § 704.45.

Only New Jersey and Minnesota appear to go beyond the tenancy-related rights enumerated above. The New Jersey statute allows the defense of retaliation to be raised, and provides for recovery of damages, where a landlord's acts are "a reprisal for the tenant's efforts to secure or enforce any rights under the laws of ... the State of New Jersey ... or of the United States[.]" N.J.Stat.Ann. § 2A:42–10.10.

9. W.Va.Code, 37–6–30 (1978), states:
"With respect to residential property:
"(a) A landlord shall:
"(1) At the commencement of a tenancy, deliver the dwelling unit and surrounding premises in a fit and habitable condition, and shall thereafter maintain the leased property in such condition; and
"(2) Maintain the leased property in a condition that meets requirements of applicable health, safety, fire and housing codes, unless the failure to meet those requirements is the fault of the tenant, a member of his family or other person on the premises with his consent; and
"(3) In multiple housing units, keep clean, safe and in repair all common areas of the premises remaining under his control that are maintained for the use and benefit of his tenants; and
"(4) Make all repairs necessary to keep the premises in a fit and habitable condition, unless said repairs were necessitated primarily by a lack of reasonable care by the tenant, a member of his family or other person on the premises with his consent; and
"(5) Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, air-conditioning and other facilities and appliances, including elevators, supplied or required to be supplied by him by written or oral agreement or by law; and
"(6) In multiple housing units, provide and maintain appropriate conveniences for the removal of ashes, garbage, rubbish and other

W.Va. 367, 253 S.E.2d 114 (1978), we spoke at some length of the common law right of habitability which a number of courts had developed to afford protection to the residential tenant. We concluded that these rights paralleled and were spelled out in more detail in W.Va.Code, 37–6–30. In *Teller,* we also fashioned remedies for the tenant where there had been a breach of the warranty of habitability.[10] However, we had no occasion to discuss the retaliatory eviction issue in *Teller.*

█ The central theme underlying the retaliatory eviction defense is that a tenant should not be punished for claiming the benefits afforded by health and safety statutes passed for his protection. These statutory benefits become a part of his right of habitability. If the right to habitability is to have any meaning, it must enable the tenant to exercise that right by complaining about unfit conditions without fear of reprisal by his landlord. *See* Annot., 40 A.L.R.3d 753 (1971).[11]

After the seminal decision in *Edwards,* other categories of tenant activity were deemed to be protected. Such activity was protected against retaliation where it bore a relationship to some legitimate aspect of the tenancy. For example, some cases provided protection for attempts by tenants to organize to protect their rights as tenants. Others recognized the right to press complaints directly against the landlord via oral communications, petitions, and "repair and deduct" remedies. *E.g., Robinson v. Diamond Housing Corp.,* 463 F.2d 853 (D.C.Cir.1972); *Schweiger v. Superior Court,* 3 Cal.3d 507, 476 P.2d 97, 90 Cal. Rptr. 729 (1970); *Engler v. Capital Management Corp.,* 112 N.J.Super. 445, 271 A.2d 615 (Ch.Div.1970); *E. & E. Newman, Inc. v. Hallock,* 116 N.J.Super. 220, 281 A.2d 544 (App.Div.1971); *Toms Point Apartments v. Goudzward,* 72 Misc.2d 629, 339 N.Y.S.2d 281 (1972), *aff'd,* 79 Misc.2d 206, 360 N.Y.S.2d 366 (1973); *Portnoy v. Hill,* 57 Misc.2d 1097, 294 N.Y.S.2d 278 (1968); Powell, Real Property ¶ 260.6 (1986); Restatement (Second) of Property § 14.8 (1977).

A few courts recognize that even where a tenant's activity is only indirectly related to the tenancy relationship, it may be protected against retaliatory conduct if such conduct would undermine the tenancy relationship. Typical of these cases is *Wind-*

---

waste incidental to the occupancy of the dwelling unit; and

"(7) With respect to dwelling units supplied by direct public utility connections, supply running water and reasonable amounts of hot water at all times, and reasonable heat between the first day of October and the last day of April, except where the dwelling unit is so constructed that running water, heat or hot water is generated by an installation within the exclusive control of the tenant.

"(b) If a landlord's duty under the rental agreement exceeds a duty imposed by this section, that portion of the rental agreement imposing a greater duty shall control.

"(c) None of the provisions of this section shall be deemed to require the landlord to make repairs when the tenant is in arrears in payment of rent.

"(d) For the purposes of this section, the term 'multiple housing unit' shall mean a dwelling which contains a room or group of rooms located within a building or structure forming more than one habitable unit for occupants for living, sleeping, eating and cooking."

10. Syllabus Points 3, 4 and 5 of *Teller* are:
    "3. Breach of the implied warranty of habitability may constitute a defense to an action for unlawful detainer or to an action for rent or damages brought by the landlord.

"4. If a landlord breaches the implied warranty of habitability, the tenant may vacate the premises thereby terminating his obligation to pay rent or may continue to pay rent and bring his own action or counterclaim later to recover damages caused by the breach.

"5. When the warranty of habitability is breached, the tenant's damages are measured by the difference between the fair market value of the premises if they had been so warranted and the fair rental value of the premises as they were during the occupancy by the tenant in the unsafe and unsanitary condition. However, the tenant may additionally recover damages for annoyance and inconvenience proven to have resulted from the breach."

11. In a related area, we, along with a number of other courts, have recognized that an at-will employee cannot be discharged by a private employer in retaliation for exercising some substantial public policy right. *Harless v. First Nat'l Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270 (1978). *See* Annot., 12 A.L.R. 4th 544 (1982).

*ward Partners v. Delos Santos*, 59 Haw. 104, 577 P.2d 326 (1978). There a group of month-to-month tenants gave testimony before a state land use commission in opposition to a proposal to redesignate their farm property from "agricultural" to "urban" uses. The proposal was sponsored by the landlord, a land developer. As a result of coordinated activity by the tenants, the proposal was defeated. Within six months, the landlord ordered the tenants to vacate the property and brought suit for possession.

The Hawaii Supreme Court noted that statutory law provided for public hearings on proposals to redesignate property, and specifically invited the views of the affected tenants. The court determined that the legislative policy encouraging such input would be jeopardized "if ... [landlords] were permitted to retaliate against ... tenants for opposing land use changes in a public forum." 59 Haw. at 116, 577 P.2d at 333. It relied on *Pohlman v. Metropolitan Trailer Park, Inc.*, 126 N.J.Super. 114, 312 A.2d 888 (Ch.Div.1973), which involved a similar fact pattern where tenants' intervention in zoning matters to protect their tenancy was sufficiently germane to the landlord-tenant relationship to support the defense of retaliatory eviction. *See also S.P. Growers Ass'n v. Rodriguez*, 17 Cal.3d 719, 552 P.2d 721, 131 Cal.Rptr. 761 (1976) (retaliation for suit by tenant charging violation of Farm Labor Contractor Registration Act, 7 U.S.C. § 2041, *et seq.*).[12]

■ The Legislature, in giving approval to the retaliation defense, must have intended to bring our State into line with the clear weight of case law and statutory authority outlined above. We accordingly hold that retaliation may be asserted as a defense to a summary eviction proceeding under W.Va.Code, 55–3A–1, *et seq.*, if the landlord's conduct is in retaliation for the tenant's exercise of a right incidental to the tenancy.

■ Fout seeks to bring this case within the *Windward* line of authority. He argues principally that Imperial's conduct violated a public policy which promotes the rights of association and free speech by tenants.[13] We do not agree, simply because the activity that Fout points to as triggering his eviction was unrelated to the habitability of his premises.

■ From the foregoing survey of law, we are led to the conclusion that the retaliatory eviction defense must relate to activities of the tenant incidental to the tenancy. First Amendment rights of speech and association unrelated to the tenant's property interest are not protected under a retaliatory eviction defense in that they do not arise from the tenancy relationship. Such rights may, of course, be vindicated on other independent grounds.

For the reasons discussed above, the judgment of the Circuit Court of Kanawha County is affirmed.

AFFIRMED.

---

12. *Rodriguez* summarily dismissed a second claim that asserted retaliatory eviction on the theory that picketing their employer had resulted in their eviction.

13. Fout does not argue that Imperial's conduct is directly proscribed by the First and Fourteenth Amendments. It is now settled law that these Amendments protect only against "state action", and not against "[i]ndividual invasion of individual rights." *Civil Rights Cases*, 109 U.S. 3, 11, 3 S.Ct. 18, 27, 27 L.Ed. 835, 839 (1883); *see also* Stephens, *Retaliatory Eviction and the Tenant's Freedom of Speech*, 11 Real Estate L.J. 324 (1983). Where the conduct is that of a private entity, "state action" may be found only where the acts in question may fairly be attributed to the state. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Queen v. West Virginia University Hospitals, Inc.*, 179 W.Va. 95, 365 S.E.2d 375 (1987). For example, where the State actively participates in the operation or management of a rental facility, or subsidizes rental payments of tenants, constitutional protections may be applicable. *E.g., Cole v. Housing Auth. of Newport*, 435 F.2d 807 (1st Cir. 1970); *Male v. Crossroads Assoc.*, 469 F.2d 616 (2d Cir.1972); *Atkisson v. Kern County Housing Auth.*, 59 Cal.App.3d 89, 130 Cal.Rptr. 375 (1976); *Chicago Housing Auth. v. Blackman*, 4 Ill.2d 319, 122 N.E.2d 522 (1954). Here, there is no allegation of state involvement in any aspect of the tenancy.