378 S.E.2d 297

**Dennis ADAMS and Bonnie Adams**

v.

**James GAYLOCK.**

**No. 18229.**

Supreme Court of Appeals of West Virginia.

Feb. 17, 1989.

Paul R. Sheridan, Logan, for appellants.

Donald C. Wandling, Avis, Witten & Wandling, Logan, for appellee.

MILLER, Justice:

The plaintiffs below, Bonnie and Dennis Adams, brought a civil action alleging a breach of an implied warranty of habitability in regard to a mobile home they had rented from the defendant, James Gaylock. The plaintiffs subsequently were granted leave to file an amended complaint which alleged a retaliatory eviction and the intentional infliction of emotional distress as additional grounds for relief. At the conclusion of the plaintiffs' evidence, the trial court directed a verdict for the defendant. The plaintiffs appeal contending the trial court erred in directing a verdict. We agree and reverse the judgment of the trial court and remand for further proceedings.

## I.

Before reviewing the plaintiffs' evidence, we restate the standard to be applied in deciding a motion for a directed verdict. In ruling on a motion for a directed verdict at the close of the plaintiffs' evidence, the trial court and this Court on appeal must determine whether there is sufficient evidence to support a verdict against the moving party. In making this determination, we reiterated in Syllabus Point 1 of *Cook v. Heck's, Inc.*, 176 W.Va. 368, 342 S.E.2d 453

(1986), the manner in which the plaintiffs' evidence is to be viewed:

" ' "Upon a motion to direct a verdict for the defendant, every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence." Syl., *Nichols v. Raleigh–Wyoming Coal Co.*, 112 W.Va. 85, 163 S.E. 767 (1932).' Syl. pt. 1, *Totten v. Adongay*, 175 W.Va. 634, 337 S.E.2d 2 (1985)."

With that legal standard in mind, we examine the evidence the plaintiffs introduced in support of their various claims for relief. The plaintiffs testified they rented from the defendant a mobile home located in Logan County on July 10, 1986, and paid a $100 security deposit and $175 for the first month's rent. Upon moving into the mobile home, the plaintiffs noticed several defects including a missing window glass, a front door that would not lock, a rear door that left a gap when closed, and two burners on the cook stove that did not work.

After a few weeks, when the weather became especially hot in August, the plaintiffs discovered a very foul odor coming from underneath the mobile home and found that the source of the odor was stagnant water standing beneath the home. The plaintiffs upon investigation learned that the kitchen sink, the bathroom sink, and the bathtub simply drained under the mobile home and were not connected to any drainage system.

Upon discovering the water drainage problem, the plaintiffs immediately notified the defendant who took no steps to repair this problem during the plaintiffs' occupancy. Once the plaintiffs discovered the source of the problem, they took measures to reduce the drainage of water by using two dishpans to wash the dishes and disposing of the dirty water by pouring it into the toilet.

Near the end of August, the plaintiff, Bonnie Adams, turned on the electric furnace in the mobile home for the first time, but was forced to turn it off almost imme-

diately because it produced a smell like something was burning. After she contacted the local fire department, a representative came by and told her that since it was an old trailer, the furnace should not be turned on again until it had been properly inspected. She again contacted the defendant and advised him of the furnace problem, but he did not have the furnace inspected and it was not turned on again during the plaintiffs' tenancy.

The plaintiffs were unable to pay the August rent, but on August 10, 1986, the defendant accepted $100 and agreed to accept the remaining $75 on September 1, 1986. The plaintiffs subsequently refused to make further payments unless repairs were made to the mobile home.

In early September, the defendant confronted the plaintiffs and demanded rental payments. When the plaintiff, Bonnie Adams, refused to make any payment until the furnace was repaired, the defendant told her to move out and threatened to lock her out of the trailer. On September 24, 1986, the defendant went to the mobile home site and turned off the electric service to the mobile home. He placed a lock on the electric switch box and threatened to call the police if the lock was removed. He then referred to the plaintiffs as "freeloaders" and used other unflattering appellations.

On November 18, 1986, the plaintiffs found alternative housing and moved from the mobile home prior to the date of a hearing to be held in connection with an unlawful detainer action the defendant had instituted.

At trial, in addition to the plaintiffs' testimony, one of their neighbors, who had also rented a mobile home from the defendant in August, 1986, testified concerning the general condition of the plaintiffs' mobile home. She stated that from the day she moved in, she noticed something that smelled like a rotten sewer. When she asked her neighbors about it, she was told it was like that every summer. She testified that she had been in the plaintiffs' mobile home and smelled the rotten odor from the outside coming up into the home through the kitchen drain. She also indi-

cated that she had heard Bonnie Adams complain to the landlord about the door that would not lock.

In corroboration of Bonnie Adams' testimony about calling the fire department about the furnace, the neighbor stated she had seen a fire truck and firemen in the plaintiffs' home in September, 1986. She had also overheard the last portion of an encounter between Bonnie Adams and the defendant in which the landlord in a raised voice had told her that the electric had been turned off, that the electric box had been locked, and that she had one week to vacate the premises.

As evidence of the business practices of the defendant, the plaintiffs' neighbor also testified to the substantial deterioration of the floor and broken windows of her mobile home.

A sanitarian employed by the Logan County Health Department testified that she inspected the mobile home in October, 1986, and returned in November to conduct a dye test. She determined that the water from the kitchen and bathroom sinks and the bathtub discharged directly into the ground under the mobile home, and stated that standing water of this type can cause health problems and is a violation of health department regulations.

## II.

This Court in Syllabus Points 1 and 2 of *Teller v. McCoy*, 162 W.Va. 367, 253 S.E.2d 114 (1978), adopted the doctrine of implied warranty of habitability as to residential housing:

"1. There is, in a written or oral lease of residential premises, an implied warranty that the landlord shall at the commencement of a tenancy deliver the dwelling unit and surrounding premises in a fit and habitable condition and shall thereafter maintain the leased property in such condition.

"2. Since a lease of a residential dwelling is to be treated as a contract, the covenant to pay rent is dependent upon the premises being habitable. The tenants [sic] duty to pay rent is depend-

ent upon the landlord's fulfillment of the implied warranty of habitability."

We also recognized that the determination of whether a landlord has breached the implied warranty of habitability is a question of fact to be determined by the circumstances of each case, and identified several factors of importance in making the habitability determination:

"In making the determination ..., housing code violations and deficiencies should be scrutinized in light of such things as their nature, the length of time they persisted, their effect on safety and sanitation, the age of the structure, and the amount of rent charged." 162 W.Va. at 391–92, 253 S.E.2d at 128–29.

While *Teller* was pending, the legislature enacted W.Va.Code, 37–6–30,* which imposed a duty on landlords to provide fit and habitable residential property. We emphasized in *Teller* that in creating an implied warranty of habitability, we intended "in no way to impose upon the landlord a greater burden than that set forth by the Legislature in our new statute. The landlord's duty under the implied warranty and the statute are identical." 162 W.Va. at 382, 253 S.E.2d at 124.

Recently, in *Imperial Colliery Co. v. Fout,* 179 W.Va. 776, 373 S.E.2d 489 (1988), we recognized that a tenant could defend against an eviction procedure by claiming that the landlord's conduct is in retaliation "for the tenant's exercise of a right incidental to the tenancy." Syllabus, in part. We acknowledged in *Imperial Colliery,* 179 W.Va. at 780 n. 10, 373 S.E.2d at 493 n. 10, the continued vitality of *Teller* and set out Syllabus Point 5 of *Teller,* which provides the measure of damages that may be recovered where the landlord breaches the warranty of habitability:

"When the warranty of habitability is breached, the tenant's damages are measured by the difference between the fair market value of the premises if they had been so warranted and the fair rental value of the premises as they were during the occupancy by the tenant in the unsafe and unsanitary condition. However, the tenant may additionally recover damages for annoyance and inconvenience proven to have resulted from the breach."

It is apparent from the foregoing facts that the plaintiffs presented a prima facie case of a breach of the warranty of habitability and, therefore, the trial court was in error in directing a verdict against the plaintiffs. For this reason, its judgment is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

* W.Va.Code, 37–6–30 (1978), provides, in part:

"With respect to residential property:

"(a) A landlord shall:

"(1) At the commencement of a tenancy, deliver the dwelling unit and surrounding premises in a fit and habitable condition, and shall thereafter maintain the leased property in such condition; and

"(2) Maintain the leased property in a condition that meets requirements of applicable health, safety, fire and housing codes, unless the failure to meet those requirements is the fault of the tenant, a member of his family or other person on the premises with his consent; and

*    *    *    *    *    *

"(4) Make all repairs necessary to keep the premises in a fit and habitable condition, unless said repairs were necessitated primarily by a lack of reasonable care by the tenant, a member of his family or other person on the premises with his consent; and

"(5) Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, air-conditioning and other facilities and appliances, including elevators, supplied or required to be supplied by him by written or oral agreement or by law; and

*    *    *    *    *    *

"(7) With respect to dwelling units supplied by direct public utility connections, supply running water and reasonable amounts of hot water at all times, and reasonable heat between the first day of October and the last day of April, except where the dwelling unit is so constructed that running water, heat or hot water is generated by an installation within the exclusive control of the tenant.

"(b) If a landlord's duty under the rental agreement exceeds a duty imposed by this section, that portion of the rental agreement imposing a greater duty shall control.

"(c) None of the provisions of this section shall be deemed to require the landlord to make repairs when the tenant is in arrears in payment of rent."

Reversed and Remanded.

McGRAW, J., participated and concurred in this decision, but departed from the Court prior to the preparation of the opinion.

WORKMAN, J., did not participate in the consideration or decision of this case.