509 S.E.2d 579

STATE of West Virginia ex rel. Samuel ANSTEY, Petitioner,

v.

William K. DAVIS, Commissioner, Division of Corrections, and George Trent, Warden, Mt. Olive Correctional Center, Respondents.

State of West Virginia ex rel. Gary W. Sheppard and Dwaine C. King, Petitioners,

v.

William K. Davis, Commissioner, Division of Corrections, and George Trent, Warden, Mt. Olive Correctional Center, Respondents.

State of West Virginia ex rel. Larry E. James, Jr., Petitioner,

v.

William K. Davis, Commissioner, Division of Corrections, and George Trent, Warden, Mt. Olive Correctional Center, Respondents.

Charles Plantz, Appellant,

v.

George Trent, Warden, Mt. Olive Correctional Center, Appellee.

Nos. 25155–25158.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 8, 1998.

Decided Nov. 20, 1998.

Concurring Opinion of Chief Justice Davis Dec. 14, 1998.

Davis, C.J., filed separate concurring opinion.

Stephen Warner, Esq., Assistant Public Defender, Charleston, West Virginia, Attorney for the Petitioners and Appellant.

Darrell V. McGraw, Jr., Esq., Attorney General, Charles Houdyschell, Jr., Esq., Assistant Attorney General, Charleston, West Virginia, Attorneys for the Respondents and Appellee.

MAYNARD, Justice:

These consolidated proceedings involve five inmates of the Mount Olive Correctional Center who complain that the respondents and appellees, William K. Davis, Commissioner of the Division of Corrections, and George Trent, Warden of the Mount Olive Correctional Center, have deprived them of their personal computers without procedural due process of law and in retaliation for litigation against the Division of Corrections by "jailhouse lawyers." Four of the inmates, Samuel Anstey, Gary Shepherd, Dwaine King, and Larry James brought original jurisdiction petitions in this Court. The fifth inmate, Charles Plantz, appeals a dismissal of his petition for writ of mandamus in the Circuit Court of Fayette County. These cases were consolidated for argument and opinion. After a careful review of the issues

raised and the documents filed in these actions, we deny the inmates the relief which they seek.

## I.

### FACTS [1]

For over a decade, state inmates were permitted to purchase and use personal computers in their prison cells subject to certain limitations.[2] Early in 1996, prison officials at the Mount Olive Correctional Center ("Mount Olive") confiscated eleven personal computers after discovering that some inmates were using the computers to write letters to various companies containing threats of lawsuits. In addition, some inmates were charging fellow inmates for legal work done on the computers. Among the computers confiscated were those belonging to Kenneth Blevins, described as a jailhouse lawyer, and the appellant in the present case, Charles Plantz. The majority of inmates who possessed computers in their cells were allowed to keep them at that time.

Subsequently, Kenneth Blevins and other inmates instituted litigation in federal court challenging the confiscation of their computers. Apparently, this litigation resulted in settlement agreements between prison officials and inmates in which the computers of Kenneth Blevins and Charles Plantz were returned to them.[3] In their brief to this Court, the relators and the appellant (hereafter "inmates")allege that during the settlement process in the federal litigation, respondent and appellee, Mount Olive Warden

George Trent,[4] threatened to remove all personal computers from Mount Olive if the lawsuit was continued.[5]

On August 23, 1996, Warden Trent issued a directive to the inmates at Mount Olive stating, in part, that computers and related items would be "grandfathered." That is, inmates owning computers as of the date of the directive, and who met several criteria, were permitted to retain possession of their computers. However, no new computers would be permitted in the cells of inmates at Mount Olive after this date.

On August 18, 1997, respondent and appellant herein, William Davis, Commissioner of the Division of Corrections, issued policy directive 639.01 which states that inmates would no longer be permitted to possess personal computers or any related components. Inmates were to be given thirty days to make arrangements for sending their computers out of the facility, at the end of which the institution would be responsible for sending any remaining computers out of the facility. Each correctional facility was to determine the beginning date of this thirty day period. On September 8, 1997, Commissioner Davis issued policy directive 653.00, the purpose of which is to set minimum standards for the establishment and operation of law library materials and related support equipment in adult correctional facilities.

On November 10, 1997, Warden Trent issued a memorandum stating that as of December 1, 1997, personal computers and any related components would be considered

---

**1.** No evidence in these cases was taken below. Therefore, the following facts are derived from the briefs filed herein and their attached exhibits.

**2.** For example, inmates were prohibited from connecting computers to telephone lines and using computers for gambling and viewing pornographic materials.

**3.** The exact outcome of this litigation is unclear from the briefs filed with this Court. According to the brief filed on behalf of the relators and the appellant, "much of this litigation was successful for the inmates."

**4.** Howard Painter is currently the warden of the Mount Olive Correctional Center.

**5.** Attached to the brief of the inmates is a Declaration of Daniel Hedges, legal counsel for several

of the inmates in the federal lawsuit in which he states in part:

4. During the negotiations concerning settlement of this lawsuit Warden George Trent stated on July 12, 1996 that if the inmates continued to pursue said civil action and did not settle on the offered terms the Commissioner would remove all computers from Mount Olive Correctional Complex.

5. During a conference in front of federal Magistrate Judge Mary Feinberg on July 16, 1996 Leslie Kiser, general counsel for the Division of Corrections re-stated the same—that if the suit were continued and not settled on the terms the state was offering at that time the Commissioner would remove all computers from Mount Olive.

"contraband."[6] Consequently, the relators sought relief by filing *pro se* habeas or mandamus petitions with this Court. The appellant appealed *pro se* from the denial of a mandamus petition in the Fayette County Circuit Court.

By Order of May 20, 1997, this Court issued a rule to show cause why the relief requested in the petitions should not be granted against the respondents; granted the petition for appeal; consolidated the cases herein; and appointed legal counsel for the inmates.[7]

The inmates request that this Court remand their cases to the Circuit Court of Kanawha County to be consolidated with the case of *Kenneth Ray Blevins v. George Trent, Warden, et al.,* for the taking of evidence and to develop the record concerning the issues raised in their brief to this Court.[8]

## II.

### STANDARD OF REVIEW

 As noted above, these consolidated cases include original proceedings in both habeas corpus and mandamus and an appeal from the circuit court's denial of a mandamus

petition. "Our standard of appellate review of a circuit court's decision to refuse to grant relief through an extraordinary writ of mandamus is *de novo.*" *State ex rel. Warner v. Jefferson County Com'n,* 198 W.Va. 667, 671, 482 S.E.2d 652, 656 (1996). Further,

> A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Syllabus Point 2, *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969).

## III.

### DISCUSSION

#### A.

*Preliminary Considerations*

 Concerning the appropriateness of an original proceeding in habeas corpus to challenge the policy at issue, we note that "[h]abeas corpus lies to test the legality of

---

6. In the November 10, 1997 memorandum, Warden Trent stated that he had originally informed the inmates of the prohibition on personal computers two months earlier and had at that time authorized the purchase of ten IBM Wheelwriter word processors for general inmate use.

7. Each of the consolidated cases arrives in this Court by way of different procedural mechanisms and requests slightly different relief.

 Samuel Anstey, in his *pro se* habeas petition and motion for temporary restraining order or preliminary injunction, complains that his computer was "taken" without procedural due process as "mass punishment." Anstey argues that such punishment is unjust because he has done nothing wrong.

 In their *pro se* habeas petition and motion for temporary restraining order and preliminary injunction, Gary W. Sheppard and Dwaine King complain that the unconstitutional taking of Sheppard's computer has deprived King of his right to Sheppard's legal assistance. They also assert that "since the State does not provide legal assistance to inmates, the State must permit inmates to have fellow inmates assist them."

 Larry E. James, Jr., in his *pro se* mandamus petition, seeks to compel the respondents to safely store his computer. James opines that he has

been threatened with disciplinary action for not removing his computer from Mount Olive, even though he has nobody to whom he can send his computer.

 Finally, as noted above, Charles Plantz brings a *pro se* appeal from the denial of a mandamus petition in the Fayette County Circuit Court wherein he sought to compel the respondents to safely store his computer. The petition for appeal raises additional issues such as the constitutionality of the computer "seizure" and the alleged retaliation for access to the courts.

8. According to the inmates, the Blevins litigation in the Circuit Court of Kanawha County, which is Civil Action No. 97–C–2969, concerns the allegation that all inmate computers were "permanently seized" in retaliation for Blevins' litigation in federal court. According to the respondents and appellees, the litigation in Kanawha County concerns an alleged breach of the settlement agreement in the federal litigation. The inmates state in their brief that an evidentiary hearing has not yet occurred in the Circuit Court of Kanawha County because the court granted the respondents' and appellees' motion to stay proceedings until this Court resolved these consolidated cases. We do not find it necessary to remand the cases before us and we proceed to decide the issues raised herein.

the restraint under which a person is detained." *Tasker v. Griffith,* 160 W.Va. 739, 742, 238 S.E.2d 229, 231 (1977). We have distinguished between two types of restraint. *See Tasker.* The traditional use of habeas corpus, not involved here, is to challenge the restraint imposed on the petitioner by testing the constitutionality of his underlying conviction. The second is the restraint imposed on the petitioner because of his incarceration and is not related to the original conviction. This includes, for example, challenges to the constitutionality of prison discipline, conditions, and regulations. This Court has held that the scope of the writ of habeas corpus extends to cover challenges to this second type of restraint. *See Tasker, supra* (finding that the scope of the writ of habeas corpus extends to cover a challenge to the petitioner's restraint in administrative segregation because of his alleged infraction of prison rules and regulations). In fact, this Court has had ample occasion to grapple with the issue of prison conditions in recent decades. *See, e.g., Crain v. Bordenkircher,* 176 W.Va. 338, 342 S.E.2d 422 (1986); *Hackl v. Dale,* 171 W.Va. 415, 299 S.E.2d 26 (1982); *Hickson v. Kellison,* 170 W.Va. 732, 296 S.E.2d 855 (1982); *Harrah v. Leverette,* 165 W.Va. 665, 271 S.E.2d 322 (1980); *Tasker, supra;* and *State ex rel. Pingley v. Coiner,* 155 W.Va. 591, 186 S.E.2d 220 (1972).

When considering challenges to prison regulations, we are ever mindful of both the natural conditions which accompany incarceration for breaking society's laws and the contrasting roles of prison administrators and judges. Incarceration necessarily involves substantial limitations upon a prisoner's personal liberty. "Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a 'retraction justified by the considerations underlying our penal system.'" *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 950 (1974) (citation omitted). The primary responsibility for ensuring the orderly and effective maintenance of our penal system rests with prison administrators. These administrators are the ones responsible for developing and implementing the policies and procedures which are designed to guarantee that the various goals of

incarceration are realized. This Court has recognized that prison administrators have broad discretion in the management of correctional facilities. For example, this Court has stated that "[t]he maintenance of discipline in a jail is essential to the effective and proper operation of a penal system and is an executive function with which courts ordinarily will not interfere." Syllabus Point 2, *Drake v. Airhart,* 162 W.Va. 98, 245 S.E.2d 853 (1978). Also, "[p]rison officials are vested with wide discretion in disciplining prisoners committed to their custody[.]" Syllabus Point 3, in part, *Id.*

On the other hand, "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Wolff,* 418 U.S. at 555, 94 S.Ct. at 2974, 41 L.Ed.2d at 950. For example, we have stated that "[c]ertain conditions of jail confinement may be so lacking in the area of adequate food, clothing, shelter, sanitation, medical care and personal safety as to constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution." Syllabus Point 2, *Hickson, supra.* Also, due process guarantees continue to operate in a prison context. (*See Harrah, supra,* where we set forth the due process requirements for prison disciplinary hearings). It is obvious, therefore, that this Court *will* disturb the actions of prison administrators that infringe basic constitutional rights. *See Drake, supra.* Because the instant consolidated cases concern alleged violations of a constitutional nature, they are properly before this Court. In deciding these cases, we must achieve in the prison context a "mutual accommodation between institutional needs and objectives and the provisions of the Constitution[.]" *Wolff,* 418 U.S. at 556, 94 S.Ct. at 2975, 41 L.Ed.2d at 951. In seeking the proper balance, we are careful not to usurp the authority of prison administrators, yet we must be vigilant in not relinquishing this Court's role as guardian of fundamental constitutional commitments. With these considerations as our cynosure, we now proceed to discuss the specific issues before us.

## B.

### *General Right of Inmates to Possess Computers*

■ In their brief to this Court, the inmates specifically request that this Court *not* decide the issue of whether inmates have a general right to possess computers in their cells. The inmates argue, instead, that our decision here should hinge on the specific facts of the cases before us. We disagree. The initial determination of whether there exists a general right of inmates to possess computers provides the proper starting point for examining the more limited questions raised in these cases.

It is generally held that unless other constitutional rights are involved, prisons may disallow the possession of personal property. *See Bannan v. Angelone*, 962 F.Supp. 71 (W.D.Va.1996) (upholding policy disallowing word processors and typewriters where plaintiff presented no specific facts indicating any substantial likelihood of prejudice stemming from the denial of a typewriter or word processor). Although there appear to be few cases from other jurisdictions concerning inmates' right to possess computers, there are several cases involving the right to possess typewriters or word processors. These cases usually arise from inmates' claims that prohibitions on the possession of typewriters or word processors impede their constitutional right of access to the courts. For the most part, courts have not been sympathetic to such claims. While "due process requires that prisoners have access to paper, pens, notarial services, stamps, and adequate library facilities, ... there is '... no constitutional right to a typewriter as an incident to the right of access to the courts.'" *Taylor v. Coughlin*, 29 F.3d 39, 40 (2nd Cir.1994), *quoting Wolfish v. Levi*, 573 F.2d 118, 132 (2d Cir.1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Likewise, in *Sasnett v. Department of Corrections*, 891 F.Supp. 1305, 1313 (W.D.Wis.1995), *aff'd, Sasnett v. Sullivan*, 91 F.3d 1018 (7th Cir.1996), *vacated on other grounds*, 521 U.S. 1114, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997), the court held:

> The right of access to the courts incorporates a right to state-supplied pen and paper to draft legal documents, *Bounds*, 430 U.S. at 824, 97 S.Ct. at 1496, but does not require such sophisticated tools as computers and memory typewriters.

*See Sands v. Lewis*, 886 F.2d 1166 (9th Cir. 1989) (no constitutional right to memory typewriters); *cf. United States ex rel. v. Lane*, 718 F.2d 226, 232 (7th Cir.1983) (criminal defendant has no right of access to computerized legal research system upon forgoing right to court appointed counsel). The right of access does not mandate even the provision of ordinary typewriters. *Jackson v. Arizona*, 885 F.2d 639, 641 (9th Cir.1989); *Twyman v. Crisp*, 584 F.2d 352, 358 (10th Cir.1978); *Wolfish v. Levi*, 573 F.2d 118 (2nd Cir.1978), *rev'd on other grounds*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1978); *Tarlton v. Henderson*, 467 F.2d 200 (5th Cir.1972); *Inmates, Washington County Jail v. England*, 516 F.Supp. 132, 140 (E.D.Tenn. 1980), *aff'd without opinion*, 659 F.2d 1081 (6th Cir.1981).

*See also, Brinson v. McKeeman*, 992 F.Supp. 897, 910 (W.D.Tex.1997) ("access to typewriters and copy machines is *not* an essential part of the right of access to the courts." (Footnote omitted)); *Blades v. Twomey*, 159 A.D.2d 868, 553 N.Y.S.2d 215 (A.D.3 Dept. 1990) (upholding prison regulation denying to inmate legal assistant possession of typewriter with value over $200); *Martin v. Jeffes*, 93 Pa.Cmwlth. 82, 86, 501 A.2d 308, 310 (1985) ("Petitioner has *no* constitutional right to possess a typewriter in prison."); and *Sands v. Lewis, supra.* We are persuaded by the uniformity of opinion on this issue and therefore hold that prison inmates have no constitutional right to possess personal computers in their cells.

## C.

### *Issue 1: Creation of Property Interests*

■ Our determination that inmates have no general constitutional right to possess computers does not completely dispose of these cases. The inmates make several specific allegations concerning why the removal of their computers is wrong under the particular circumstances involved here. First, the

inmates allege that they acquired a property interest in their computers because of the decade long policy permitting computers in the cells so that they are entitled to procedural due process prior to the removal of the computers. In support of this argument, the inmates cite *Spruytte v. Department of Corrections,* 184 Mich.App. 423, 459 N.W.2d 52 (1990) where the court found that inmates enjoyed a protected property interest in acquiring possession of a personal computer by virtue of a state administrative rule.

■ The Fourteenth Amendment of the Federal Constitution provides, in part, that the State may not "deprive any person of life, liberty, or property, without due process of law[.]" "The Due Process Clause, Article III, Section 10 of the West Virginia Constitution, requires procedural safeguards against State action which affects a liberty or property interest." Syllabus Point 1, *Waite v. Civil Service Commission,* 161 W.Va. 154, 241 S.E.2d 164 (1977). To determine whether the prison administrators violated the due process rights of the inmates, we must first determine whether the inmates have a property interest in the possession of personal computers in their cells and, second, whether the inmates were deprived of this property interest without due process of law. *See Hutchison v. City of Huntington,* 198 W.Va. 139, 479 S.E.2d 649 (1996).

■ "Although the Constitution protects property interests, it does not create them. To decide whether the plaintiff had a property interest at stake, we look to see whether some independent source, such as federal, state, or local law, has created an enforceable expectation." *Hutchison,* 198 W.Va. at 154, 479 S.E.2d at 664 (footnote omitted). This Court has stated that "[a] 'property interest' includes not only the traditional notions of real and personal property, but also extends to those benefits to which an individual may be deemed to have a legitimate claim of entitlement under existing rules or understandings." Syllabus Point 3, *Waite, supra.*

To have a property interest, the plaintiff must demonstrate "more than an abstract need or desire for it.... He must, instead, have a legitimate claim of entitle-

ment to it" under state or federal law. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Additionally, the protected property interest is present only when the individual has a *reasonable* expectation of entitlement deriving from the independent source. State laws therefore guide us in deciding whether plaintiff possessed only an unprotected unilateral expectation of a claim of entitlement, or instead had a constitutional-protected "legitimate claim of entitlement." *Id.*

*Hutchison,* 198 W.Va. at 154, 479 S.E.2d at 664.

■ Property interests, however, do not arise from policies promulgated solely at the discretion of state officials. In *Escobar v. Landwehr,* 837 F.Supp. 284 (W.D.Wis.1993), an inmate claimed that he was deprived of his property without due process of law when he was forced to ship personal items out of the correctional facility pursuant to new internal management procedures. The court stated that it found nothing in Wisconsin's statutes or regulations that could give rise to a *reasonable* expectation on the part of the inmate in the continued possession of the now forbidden property, noting, instead, that these statutes and rules placed issues of inmate property in the discretion of prison officials. The court opined that "[w]hen state law vests permission to possess or obtain certain property in an official's discretion rather than the application of concrete rules, 'there is no property.' " *Escobar,* 837 F.Supp. at 288 (citation omitted).

Likewise, we have found no laws or regulations that grant to the inmates a property interest in the possession of computers, and the inmates cite to none. They base their claims, instead, on the decade long policy of allowing computers in inmates' cells and the warden's memo of August 23, 1996 which stated that inmates already possessing computers on that date would be allowed to retain them. These policies, however, reside solely in the discretion of prison administrators. This discretion is pursuant to both statute and administrative regulation. W.Va. Code § 28–5–2 (1923) grants to the Commissioner of Corrections the authority to "make

such rules and regulations as the commissioner may deem best" as to the overall management of prison inmates. W.Va.Code § 28–5–3 (1974) provides, in part, that "[t]he warden shall be the chief executive officer of the penitentiary and shall have charge of its internal police and management[.]" Further, the warden "shall have the custody and control of all the real and personal property at the penitentiary, subject to the orders of the [Commissioner of Corrections]." W.Va.Code § 28–5–3, in part. Finally, 95 C.S.R. 2, § 18.4 (1996) provides that, "[p]rocedures shall specify the personal property inmates can retain in their possession."

The policies relied upon by the inmates are merely the internal operating procedures of the facility and are easily revoked by the issuance of subsequent policy statements. One policy is regularly replaced by another as prison administrators deem best. This flexibility allows prison administrators to respond appropriately to the unique challenges of prison management. The inmates urge this Court to hold that prison administrators are prohibited from altering a policy that has been in effect for any length of time without the operation of due process procedures. Such a holding would not only have no basis in law but also would be unwieldy and unworkable. We conclude, therefore, that the policies relied upon by the inmates are insufficient to create a property interest. Consequently, the inmates have no property interest in the continued possession of personal computers in their prison cells. Accordingly, due process of law is not necessary under the facts of these cases.

▋ In their brief to this Court, the inmates characterize the removal of their computers as a "taking." It is undisputed that the computers at issue are the personal property of the inmates. Therefore, due process of law would be necessary before state officials could deprive the inmates of the ownership of these computers. The challenged policy, however, results in no deprivation because it merely requires inmates who own computers to send them out of the facility to an address of their choosing. The circumstances at hand are similar to those in *Williams v. Meese,* 926 F.2d 994 (10th Cir.

1991) where prison officials seized an inmate's ring and postage stamps and sent them to an address supplied by the inmate. The court found that "[a]lthough plaintiff no longer has possession of the property, he still retains control over it and, therefore, has not been 'deprived' of the property." *Williams,* 926 F.2d at 998. Likewise, in *Zatko v. Rowland,* 835 F.Supp. 1174 (N.D.Cal.1993), the court found that an inmate was not deprived of his postage stamps where the stamps were replaced with embossed envelopes, and the inmate had the opportunity to mail the excess stamps home or donate them to the state. We agree with the reasoning in these cases and find that because the policy at issue does not cause a deprivation of property, due process of law is not required.

### D.

*Issue 2: Reasonable Access to the Courts*

▋ Second, the inmates aver that the loss of their computers infringes on the right of reasonable access to the courts. In their brief to this Court, they do not set forth specific factual allegations to support this claim but merely state that "[t]his situation is a complex factual issue being litigated in [Kanawha County Circuit Court] and includes issues such as inadequate legal assistance to inmates ..., inadequate time in the law library, and limited amount of paperwork allowed in each inmates' cell."

▋ In the recent case of *State ex rel. James v. Hun,* 201 W.Va. 139, 494 S.E.2d 503 (1997) *(per curiam),* we discussed the constitutional requirement that prison inmates have a right of meaningful access to the courts. There we stated that "this right of meaningful access to the courts is not completely unfettered." *James,* 201 W.Va. at 141, 494 S.E.2d at 505. Rather,

> the State may impose reasonable restrictions and restraints upon the acknowledged propensity of prisoners to abuse both the giving and the seeking of assistance in the preparation of applications for relief: for example, by limitations on the time and location of such activities and the imposition of punishment for the giving or

receipt of consideration in connection with such activities.

*Id.,* (*quoting Johnson v. Avery,* 393 U.S. 483, 490, 89 S.Ct. 747, 751, 21 L.Ed.2d 718, 724 (1969)). In *James* we concluded that limiting the amount of personal property, including legal documents which an inmate may possess, to that which he can fit into a locker box and two large plastic containers, is a reasonable restriction on an inmate's right of meaningful access to the courts.

■ In the present case, we believe that prohibiting the possession of personal computers in inmates' cells is certainly a reasonable restriction. "The law is well established that a state has 'a compelling interest in maintaining security and order in its prisons[.]'" *Harris v. Forsyth,* 735 F.2d 1235 (11th Cir.1984) (citation omitted). The possession of computers by inmates compromises security and order by providing the capability to store vast amounts of information that is not easily detectable during searches of inmates' cells. Further, almost unlimited quantities of material may be stored in computers. Pornography, gambling information, accounts of inmates' indebtedness to other inmates, guards' schedules, and escape plans are only a few such examples. This list of illegal uses of a computer is limited only by the imaginations of those with technological capability, anti-social propensities, larceny and mischief in their hearts, and a lot of spare time on their hands. In addition, as noted above, the overwhelming majority of courts that have decided the issue have found that the right of access to the courts does not include the right to possess typewriters and computers. We hold, therefore, that the right of meaningful access to the courts does not include the right of inmates to possess computers in their prison cells.

### E.

#### Issue 3: Detrimental Reliance

■ Next, the inmates argue that inmates who purchased computers in reliance on the decade long policy permitting comput-

ers in the cells are entitled to reimbursement for the loss of the use of their computers. According to the inmates,

> [u]nder basic contract law, the [inmates] have been harmed as a result of their detrimental reliance on the respondents' decade-long policy permitting computers. If [inmates] can sell their computers for a reasonable price, or, if they choose to give their computers to someone outside the prison as a gift, then the actual harm is limited. Otherwise, compensation should be in order.

The inmates' invocation of the doctrine of detrimental reliance or promissory estoppel is misplaced for several reasons. First, as noted previously, three of the inmates are before this Court by way of original proceedings in *habeas corpus.* While the proper use of *habeas corpus* is to test the constitutionality of the petitioner's restraint, it is not the proper mechanism by which to bring a contract action. Also, promissory estoppel is not applicable to the facts of this case.

> In general promissory estoppel is an equitable doctrine which, under certain circumstances, will nullify the defense of lack of consideration in a contract action. 7 M.J., Estoppel, § 14. Thus in certain circumstances where the promisor leads the promisee to rely to his detriment courts will permit the promisee to recover in spite of a lack of consideration to the promisor.

*Cochran v. Ollis Creek Coal Company,* 157 W.Va. 931, 936–937, 206 S.E.2d 410, 414 (1974). The relationship between prison administrators and the inmates under their charge simply is not a contractual one. The policies promulgated by administrators cannot fairly be characterized as promises so as to create a promisor—promisee relationship.[9]

### F.

#### Retaliation Claim

■ The inmates also argue that the prison administrators removed their computers in retaliation for the exercise of their constitutional right of meaningful access to the courts. In support of their argument,

---

9. We note, also, that one shudders to think what the reaction of the public would be if this Court

were to order that damages be awarded to the inmates under these specific circumstances.

the inmates rely on *Mathis v. Sauser,* 942 P.2d 1117 (Alaska 1997). In *Sauser* prison administrators promulgated a new policy that specifically prohibited inmates from possessing computers (except the laptop variety) and printers. The official rationale given for the new policy included the belief that "prisoners have been utilizing computers to harass prison officials at [the prison] with frivolous litigation and large amounts of paperwork." *Sauser,* 942 P.2d at 1119. Inmate Mathis protested the impending seizure of his printer, alleging that the anticipated action violated his constitutional right of access to the courts. The court found that the stated rationale for the new policy was an impermissible attempt by administrators to curtail frivolous litigation, a responsibility which rests primarily with the judiciary. The court explained:

> The question before us is not whether Mathis possesses a constitutional right to have a printer in his cell. Rather, we must determine whether Mathis, under Alaska's constitution, has a constitutionally protected interest in not being deprived of his printer if the rationale behind such deprivation is to restrict his right of access to the courts. Our inquiry is framed by the record in this case, which suggests that the [Standard Operating Procedure] may have been promulgated to address the "problem" of pro se litigation on the part of . . . inmates.

*Sauser,* 942 P.2d at 1120 (footnote omitted). The inmates urge us to adopt the same approach as the Alaska court and find that "the respondents have confiscated the computers of the petitioners and the appellant in response to inmate use of computers to access the courts, and, specifically, to discourage and send a message to all inmates that the respondents will not punish for the use of the courts like Kenneth Blevins."

 "Prison officials may not retaliate against an inmate because of the inmate's exercise of his right of access to the courts."

Aguilar v. Chastain, 923 S.W.2d 740, 744 (Tex.App.1996). See also Boblett v. Angelone, 942 F.Supp. 251 (W.D.Va.1996), aff'd, 121 F.3d 697 (4th Cir.1997); Hudspeth v. Figgins, 584 F.2d 1345 (4th Cir.1978), cert. denied, 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 386 (1979); and Johnson v. Rodriguez, 110 F.3d 299 (5th Cir.1997), cert denied, ── U.S. ──, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997). Such retaliatory conduct is actionable because it may tend to chill inmates' exercise of their constitutional right of access to the courts. See ACLU of Maryland, Inc. v. Wicomico County, Md., 999 F.2d 780 (4th Cir.1993).

The elements of a claim under a retaliation theory are the plaintiff's invocation of "a specific constitutional right," the defendant's intent to retaliate against the plaintiff for his or her exercise of that right, a retaliatory adverse act, and causation, *i.e.,* "but for the retaliatory motive the complained of incident . . . would not have occurred." [10] *Johnson, supra,* 110 F.3d at 310 (citation omitted and footnote added). "The constitutional right of access to the courts encompasses only an inmate's *own* reasonably adequate opportunity to file nonfrivolous legal claims challenging [his] convictions or conditions of confinement." *Johnson,* 110 F.3d at 310–311, *citing Lewis v. Casey,* 518 U.S. 343, 356, 116 S.Ct. 2174, 2182, 135 L.Ed.2d 606, 621 (1996). It does *not* include secondary litigation activity such as a jailhouse lawyer's legal work on behalf of other inmates. See *Johnson, supra.* The alleged adverse retaliatory act must result in some adversity to the inmate who exercised his right of access to the courts "to warrant concern about a chilling effect on the exercise of his right to access the courts." *Boblett,* 942 F.Supp. at 254. Finally, a prisoner alleging retaliation must allege sufficient facts tending to support his allegation of retaliation. See *White v. White,* 886 F.2d 721 (4th Cir.1989). Broad assertions of retaliation are not sufficient.

---

10. This Court has also addressed retaliation claims in other contexts, such as employment relations, for which it has crafted different rules. *See e.g., Harless v. First National Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270 (1978); *McClung v. Marion County Commission,* 178 W.Va. 444, 360 S.E.2d 221 (1987); and *Imperial Colliery Co. v. Fout,* 179 W.Va. 776, 373 S.E.2d 489 (1988). It is important to note that the elements set forth above apply only in the prison context.

Examining the allegations before us in light of the above standards, we find that the inmates fail to state claims for retaliation. Our review of applicable cases from other jurisdictions reveals that retaliation claims usually concern an individual prisoner or class of prisoners, each of whom exercised a fundamental right and suffered an alleged retaliatory action. *See e.g., Boblett, supra* (prisoner alleged harassment and termination from employment for availing himself of grievance procedure); *Thomas v. Collins,* 960 S.W.2d 106 (Tex.App.1997) (prisoner alleged that he was held in administrative segregation for filing grievance and lawsuit); *Johnson, supra* (prisoner brought action on his own behalf and the behalf of a class of prisoners alleging that the state parole scheme in which prisoners' litigation history was a factor in the parole process violated the right of access to the courts); *Aguilar, supra* (inmate alleged that destruction of legal papers during a cell search was retaliation for his involvement in a federal civil rights suit); and *Hudspeth, supra* (prisoner alleged threat of physical harm by guard in retaliation for litigation). The deprivation or hardship suffered by prisoners in such cases generally is not actionable but for the fact that it allegedly occurred in response to the invocation of a constitutional right and was intended to chill the future exercise of that right. Courts regularly must infer wrongful intent and find the necessary degree of causation from the fact that a prisoner or prisoners exercised a right and soon thereafter experienced an adverse act. Therefore, a retaliation claim must include all of the elements stated above and must set them forth with specificity.

In the present cases, each inmate fails to state a claim for retaliation in that each fails to allege that *he* exercised a fundamental right for which he suffered the removal of his computer. Each instead avers that Kenneth Blevins and others brought a lawsuit for which all prisoners are now denied possession of their computers.[11] This allegation does not meet the initial threshold requirement of a retaliatory claim, i.e., the *plaintiff's* invocation of a specific constitutional right. Absent this, the connection between the invocation of the right and the subsequent adverse act is insufficient to prove intent and causation.

In addition, we believe that retaliation claims which allege that the adverse act is an institution-wide policy are problematic. This is so because the nexus between the invocation of the constitutional right and the subsequent adverse act in most cases would be too tenuous to prove "but·for" causation. Proving the requisite intent would also be difficult. A prisoner who alleges retaliation in such a case would be burdened with proving that he exercised a specific constitutional right, the subsequent enactment of an institution-wide policy *with the intent to retaliate against the plaintiff for his exercise of the right,* and that the policy would not have been promulgated but for the retaliatory motive. While it is not necessarily this Court's belief that such a claim could never be successful, the circumstances giving rise to such a claim would be rare.

Consequently, this Court will generally determine the constitutionality of a challenged prison policy, not by the legitimacy of the motivations for its enactment, but according to whether the policy results in a violation of a fundamental right. We are convinced that this approach enjoys several advantages. First, it prevents inmates from challenging otherwise legitimate policies simply by alleging retaliation. If we were to adopt the position urged on us by the inmates, policies properly instituted by administrators would be subject to an entirely new avenue of challenge. This, in turn, would increase litigation. Second, our

---

11. While the appellant, Charles Plantz, apparently was a party to the Blevins litigation in federal court, he fails to set forth a specific claim of retaliation, alleging instead that "[t]he removal order is the subject of numerous lawsuits and other civil actions, because it was initiated as retaliation for access to the courts, in contravention of the State & Federal Constitutions."

Plantz notes the alleged verbal threat made by Warden Trent during the Blevins litigation "that if those inmates pursued their litigation through to relief, respondent would take the inmate personal computers[.]" This broad assertion, however, is simply not sufficient to constitute a retaliation claim.

approach recognizes the broad discretion of prison administrators to enact the policies necessary to ensure the safety and security of both prisoners and prison personnel. Third, it confines retaliation theory to the narrow circumstances for which it was intended. Finally, it relieves courts of the dubious task of parsing the motives of prison administrators in the enactment of policies which would otherwise pass constitutional muster. We therefore find no merit in the inmates' retaliation claims.

## G.

### Prison Administrators' Duty to Store Property

■ Finally, the inmates claim that the prison administrators have a statutory duty to safely store the inmates' computers. They hinge their argument on 95 C.S.R. 2, § 18.5 (1996) which states:

Security of Personal Property. Procedures shall govern the control and safeguarding of inmate personal property. Personal property retained at the correctional facility shall be itemized in a written list which is kept in the permanent file. The inmate shall receive a current copy of this list. All inmate's property retained by the correctional facility shall be accurately inventoried, handled carefully and securely stored. The property shall be available if required by the inmate and returned at the time of release. Confiscated items shall be noted on the inventory list which is signed by the inmate. Receipts shall be provided to the inmate for all funds and possessions stored, and upon release from the correctional facility, receipts shall be signed by inmates acknowledging return of their property.

A careful reading of the regulation reveals that it does not *mandate* the storing of any personal property by prison administrators but merely states the procedures to be followed *if* personal property is stored. Therefore, we are not persuaded by the inmates' reliance on this administrative regulation. By its own terms, it only governs personal property *retained at the correctional facility.* In *Nitcher v. Armontrout,* 778 S.W.2d 231 (Mo.App.1989), the court held that a prison regulation which stated that inmates' excess personal property was to be mailed to the inmates' families, donated to a charitable organization, or destroyed after being stored for ninety days did not conflict with a statute *requiring* the administrative officer to take charge of the inmates' property and return it to them upon release. The court reasoned that the means for returning property to the inmates through family members or visitors provided an adequate substitute. Here, unlike in *Nitcher,* this Court is not aware of any statute or regulation mandating the storage of inmates' personal property. Even if there were such a rule, however, under the reasoning in *Nitcher,* it would not necessarily conflict with the challenged policy.

We recognize, however, that there may be mitigating circumstances that call for flexibility on the part of prison administrators. The instant cases may present such circumstances. The inmates have invested substantial funds in their computers and must now decide how best to dispose of them. Inmates who have family members or friends who are willing to receive the computers are presented with a ready solution. However, those inmates who have no one outside to whom they can send their computers are confronted with a genuine dilemma. In such circumstances, we believe it is important that the warden store these computers for a *reasonable* amount of time so as to allow the inmates the opportunity to make appropriate arrangements for the storage, sale or disposal of their computers. What constitutes a reasonable amount of time may depend, in part, on the efforts of each inmate to locate suitable outside storage or other disposal method. The burden rests with each inmate to keep prison administrators apprised of his efforts. We are confident that in this way the computers can be disposed of in a timely manner to the satisfaction of all parties.

## IV.

### CONCLUSION

For the reasons set forth above, we conclude that the contentions of the inmates are without merit. We therefore affirm the or-

der of the Circuit Court of Fayette County which denied the relief sought by the appellant. It is also adjudged and ordered that the various writs of the relators heretofore issued be, and the same hereby are, dismissed.

No. 25155—Writ denied.

No. 25156—Writ denied.

No. 25157—Writ denied.

No. 25158—Affirmed.

DAVIS, Chief Justice, concurring:

(Filed Dec. 14, 1998)

The disposition of this case by the majority opinion is legally correct, and I embrace it wholeheartedly. I have chosen to write separately only for the purpose of clarifying a point regarding limitations on the use of the habeas corpus petition.

## A Habeas Corpus Petition Is Appropriate Only When A Prisoner Seeks Actual Release From Custody

In the past, this Court has allowed "conditions" of incarceration to form the basis for a habeas corpus proceeding. However, we have previously addressed conditions of incarceration in relation to a habeas petition, only in the context of inmates seeking *actual release* from confinement due to challenged prison conditions. *See Crain v. Bordenkircher*, 176 W.Va. 338, 342 S.E.2d 422 (1986). In the instant proceeding, inmates complained that their personal computers were taken from them. Confiscation of computers from inmates, in and of itself, is not a proper basis for the filing or the granting of a habeas petition. In such a circumstance, the appropriate remedy may be relief through injunction, mandamus or prohibition. *See Bishop v. McCoy*, 174 W.Va. 99, 323 S.E.2d 140 (1984) (granting mandamus requiring inmate be placed in protective custo-

dy). To transform the confiscation of computers or anything else by prison officials into an issue appropriate for habeas review, there must be allegations charging that, as a result of such confiscation, confinement has become cruel and unusual punishment and requires release. Without such averments, a writ of habeas corpus simply is not the vehicle for challenging the confiscation of inmate property. As we held in Syllabus point 1 of *State ex rel. Pingley v. Coiner*, 155 W.Va. 591, 186 S.E.2d 220 (1972), "[h]abeas corpus lies to secure relief from conditions of imprisonment which constitute cruel and unusual punishment in violation of the provisions of Article III, Section 5, of the Constitution of West Virginia and of the Eighth Amendment to the Constitution of the United States." *See* Syl. pt. 1, *Crain v. Bordenkircher*, 176 W.Va. 338, 342 S.E.2d 422; Syl. pt. 2, *State ex rel. J.D.W. v. Harris*, 173 W.Va. 690, 319 S.E.2d 815 (1984); Syl. pt. 1, *Hickson v. Kellison*, 170 W.Va. 732, 296 S.E.2d 855 (1982); Syl. pt. 1, *State ex rel. K.W. v. Werner*, 161 W.Va. 192, 242 S.E.2d 907 (1978). To be clear, habeas is a vehicle for seeking release from confinement. *See Brightman v. Withrow*, 172 W.Va. 235, 304 S.E.2d 688 (1983); *Hackl v. Dale*, 171 W.Va. 415, 299 S.E.2d 26 (1982); *Harrah v. Leverette*, 165 W.Va. 665, 271 S.E.2d 322 (1980).[1] Thus, to the extent that the majority opinion might be wrongly construed, my concurrence has been appended to make clear the standing of our law on this issue.

---

1. We carved out a narrow exception to this rule in *State ex rel. Blake v. Chafin*, 183 W.Va. 269, 395 S.E.2d 513 (1990). *Blake* was presented to this Court as a mandamus proceeding in which the petitioner sought to compel a circuit court to review a habeas corpus petition. We held:

Although there may be occasions where the validity of one sentence has been upheld in review and the review of a separate conviction will not alter the circumstances of a defendant's confinement, a defendant is still entitled to a ruling on the merits when post-conviction habeas corpus relief is sought. A court cannot summarily dismiss a petition relying upon the concurrent sentence rule, since we refuse to adopt that rule.

Syl. Pt. 1, *id.*